Peck, J.,
delivered the opinion of the court:
Henry Wayne, a person of color, a resident of Savannah, Georgia, by occupation a livery-stable keeper, by his petition claims the proceeds of thirty-three bales of upland cotton, which he had in possession at the time of the capture of Savannah by the Federal forces, on the twenty-first of December, 1864, which proceeds he avers are in the Treasury. The action is founded upon the provisions of the act approved 12th March, 1863, in relation to captured and abandoned property.
We find the facts to be, that claimant purchased with Confederate money thirty-three bales of cotton, on or about the 10th of December, 1864. That he had the cotton in possession when Savannah was captured. That sixteen bales of the cotton . were taken from him by the officers of the United States, and were sold and the proceeds are now in the Treasury. That seventeen of the thirty-three bales were destroyed by fire, and did not reach the custody of the agents of the United States; and that the claimant never gave aid or comfort to the rebellion against the United States.
The petition was filed on the 15th of November, 1867, and the defendants by their brief claim the benefit of the statute of limitations.
*428 Tbe claimant was a keeper of a livery and sale stable, often having a large number of horses under his care and management. He was, as one of the witnesses calls him, “ a thrifty man.” The same witness says he knew that claimant had money, and upon his advice being asked about its investment, the witness advised claimant to invest in cotton; as, being a colored man, by the laws of Georgia he could not invest in real estate. The witness accompanied claimant to' dealers in cotton and saw him pay money for cotton to them. At a later day the same witness again met the claimant at the place of business of the vendors of the cotton, and saw him paying for cotton, as witness understood, about fifteen thousand dollars. The money paid was Confederate money. One of the vendors of the cotton deposes that the whole amount was paid by instalments, and that he received the money with his own hands; and that he knows what he did with it.
The special counsel for the Treasury Department wishes it inferred from the fact that the cotton was purchased by claimant so short a time before the city was taken by General Sherman, that the sale to claimant-was colorable. Claimant had the depreciated currency on his hands, and the nearer the Federal forces approached the city, the more his nominal money depreciated ) the vendors had the cotton, and, as one of them says he knows what he did with the money he got from claimant, he probably knew at the tiifie of sale what he could do with that money with advantage to himself, and he was willing to barter a commodity he had an excess of, or did not want, for another commodity more useful or valuable to him than that which he desired to part with. We do not see anything colorable in the transaction. If the city of Savannah fell, the cotton would probably be of greater value than the Confederate money,- the claimant, therefore, preferred the cotton. The vendors knowing what they could do with the Confederate money with better * advantage to themselves than to hold the cotton, desired to make the exchange.
The suspicion which might arise from the fact of the purchase, at a time when General Sherman was approaching Savannah, is overthrown by the testimony, which plainly excludes any inference that the sale was colorable, or in fraud of the law, or was not in good faith. The purchase was made some days prior to the fall of Savannah. The money was paid in in- *429 stalments, which implies time. There is no appearance of collusion or deceit in the transaction. In investigating the question of fairness, so as to exclude such as have given aid or comfort to the rebellion, from participating' directly or indirectly in the benflts of the proceeds of captured and abandoned property, we have always considered that the honesty of the transaction, as well as loyal conduct, should be the proper tests. If we are called upon to decide that all purchases and sales are tainted with fraud, merely because there was a probability that the rebellion would be overborne in whole or in the localities where the transactions took place, we have to reply that the law does not contemplate any such action on our part, and requires of us only that we shall examine and consider the integrity of the conduct of the claimant. If he should fail in his allegiance on the day before the capture of a city he would not recover ; if he remains true to his allegiance and acquires property but a day previous to a capture, with no purpose but a fair and honest one, and the proceeds of that property should reach the Treasury, the law should give relief; since its purpose appears to have been to reward those who observed their fidelity to the Union, by never giving aid or comfort to rebellion. The government, by this policy, thus distinctly presented the benefits the faithful would receive for their fidelity, and the losses the unfaithful would suffer for their want of it. Encouraging the good and reprobating the disloyal citizen. The purpose of the law was not to place or keep money in the Treasury by taking it alike from the faithful and unfaithful, but it was to mark the difference between them, by rewarding one class and depriving the other.
Our attention has been called to the sixth section of the Act nth July, 1862, (2 Brightly’s Digest, p. 196,) which declares that if any person within any State or Terrritory of the United States in rebellion after the passage of that act, being engaged in armed rebellion against the government, should not within sixty days after public warning, &c., cease to aid, countenance, and abet t4he rebellion, and return to his allegimee to the United States, the estate and property, moneys, stocks, and credits of such person, should be liable to seizure, and it should be the duty of the President to use them and the proceeds of them. After the expiration of the warning aforesaid, all sales, transfers, and conveyances of such property should be null and void. *430 If a suit should be brought for the possession or use of such property, uot by the United States, for they could seize, and the act directs how they shall proceed to condemn, and by what forum; nor against the United States, for at that time no suit could be brought against them — Congress knew that no such jurisdiction had been authorized — but by some person claiming the use and possession, and suing to recover it, such person must allege and prove, as against the holder of the property, that such holder was a proscribed person under that law. The burden of proof is cast upon him who makes the averment. Thus plainly indicating that this sixth section of the act, except as to recognizing the right of the government to seize and use property, was intended only for individual suitors, and has reference to litigation between them. Except indirectly by increasing the value of property, if it should afterwards be offered for sale by the government, it had no interest in such litigation.
The seventh section of the act directs how the United States should proceed with the property seized, in order to convert it and have the avails paid into the Treasury. Hence, except as to deciding the'right of property as between individuals, the sixth section has no bearing upon, nor does it affect the United States. The sixth section does not become a question of serious inquiry in cases of claim like that we are now considering. For as to such, the United States, by the passage of the act of 1863, have waived other questions of controversy with their loyal citizens, and have consented, when an individual shall have proved certain facts specified in the act of 12th March, 1863, bringing himself favorably within its provisions, that he shall have refunded to him the net proceeds of his property, whether captured, that .[is, seized, under the act of 17th July, 1862, or otherwise. Hence, so far as the United States are concerned, the inquiry is, was the claimant faithful to his allegiance, and did he really own the property captured or seized; and not whether the property had at any time prior to the capture been owned by a rebel who now claims the benefits of the proclamation authorized by the act of 17th July, 1862. So far as a contest between individuals about property in rebellious territory, as denounced by the act in the year 1862, or for three years afterwards, is concerned, no matter what the wise intentions of the law-makers may have been, that act was *431 witbotit effect. It was not and could not be enforced within rebel territory.
How a party should establish in a controversy with some other party that he had returned to his allegiance, after warning and proclamation as required by the sixth section of the act of 1862, is not now important to be settled here.
There is no proof in the record to show that the’vendor of the cotton to claimant was engaged in armed rebellion, or that he was one of the proscribed classes of persons named in the act of 17th July, 1862. It does not anywhere appear that any steps were taken to condemn it. The title of the United States rests only in seizure or capture, and if we should pronounce the sale to claimant null and void, because of the provisions of the act of 1862, we must infer everything to his prejudice without proof, to support the conclusion. Shordd we hold all sales null and void made in rebel territory, after sixty days from the date of the proclamation, issued under the authority of the act of 17th July, 1862, except such as were made by loyal owners— so proved to be — we should go further than the act of 12th March, 1863, requires, and would imply a disability where none was intended, and so deny relief where the act would grant it.
By the act of 1863, the claimant is only required to prove to the satisfaction of this court his ownership of the property, not from a time before the rebellion, but* at the time of its capture. Nor is he required to show that he purchased of a loyal owner, nor of a person who had not been engaged in “armed rebellion.’'’ To prevent a recovery for the benefit of disloyal persons, in the name of a loyal person, we have always required that the claimant should prove that he was the real owner, and that he is not acting collusively for the benefit of another.
The claimant must overcome the presumptions which the law fixes against him because of a voluntary residence within rebel territory, &c., &c.; but he is not required to prove that his cotton never belonged to a person who had’ been engaged in armed rebellion. Do We contravene the law in so holding % The policy of the law is to favor those who remained steadfast in their allegiance. It was believed that there were some loyal persons who would be compelled, though never so reluctant, to remain within rebel territory, and they would be forced by the power of Confederate laws, the necessities of their condition and habits of life, to receive and use Confederate money. To say to *432 sucli that they shotdd be deprived of the beneficence of tbe statute because they did what they could neither avoid or resist, and live, would be harsh and unjustifiable. It would be mating them the victims rather than the beneficiaries of the law. Having the Confederate money on haud, loyal citizens had the right, and were encouraged by the statute, to mate it available by purchasing cotton. If the cotton was purchased of a rebel, the rebel cotdd not be the gainer, for as to him, neither the Confederate money nor the cotton would be of value after the capture of the city. Unless, therefore, it was the sole object of the United States to put money into its treasury by seizing and selling the cotton of all persons whomsoever, and without regard to the protection and interest of loyal citizens, we do not see why our rulings in the premises are not in harmony with the expressed policy of the government, and precisely those which the statute of 1863, so often referred to, contemplated.
We do not hold that pardon or amnesty can relieve a claimant from the proof of loyalty heretofore required; the act approved June 25,1866, entitled “An act to provide for aiipeals from the Court of Claims, and for other purposes,’ by the third section, requires affirmative proof that a claimant has consistently adhered to the United States, and a pardon or amnesty, as we have already decided this term in the case of Pargoud, is not to be substituted in this court for the proof. The jurisdiction of this court depends upon authority given it by Congress, and not upon implication. Words in acts of Congress become things to us in matters of jurisdiction, and we are not authorized to wander among acts in pari materia to gather power or jurisdiction not expressly conferred.
Under all the facts proved in this record we adjudge the claimant entitled to the net proceeds of his sixteen bales of cotton which are now in the Treasury, and we accordingly give him a judgment therefor; amounting to two thousand and forty-seven dollars and fifty-two cents, ($2,047 52.)
Casey, Oh. J.:
The construction given to the acts of 1862 and 1863 I dissent from. Upon other grounds I think the claimant entitled to recover.
*433 Nott, J., thought the only point in tbe case was determined in Pollard’s Case, anle,p. 328, and it being res adjudicatce, be concurred in tbe judgment.